Surgery Center PA v. Aetna Life Insurance Co Michael DeCicco from the law firm of Mags and McDermott for the plaintiff appellant to the Plastic Surgery Center. I'd like to reserve two minutes for rebuttal. Good morning, your honors. In this consolidated appeal, this court is presented with the opportunity to clarify and to define the scope of express preemption under ERISA in the context of a factual scenario that occurs every day in America. That factual scenario is a patient goes in for treatment for a medical provider, and the first question always asked is, what's your insurance? And the medical provider takes an insurance card and then ascertains whether in fact there is coverage. And they do that in a number of ways. Sometimes they know the scope of the plan. But more often than not, they make a telephone call to the administrator of the plan. And in making that telephone call, certain representations, information, advice is provided by the plan administrator. And when that information is provided, that often determines precisely how the medical provider is going to act. In this case, the district court erred by expanding the breadth of preemption to include independent relationships that have no relationship whatsoever with the ERISA plans at issue. Counselor, how can you say no relationship whatsoever when the two allegedly freestanding agreements that you point to, one oral and one in the pre-certification letter, both are referring to at least the rates in the plan? Your honor, that is a, in my view, that's a tangential relationship to the plan. It doesn't define the coverages. It doesn't define what the administrator will have to do. It simply sets the reimbursement rate, which is a ministerial task. Those reimbursement rates, because they're set forth in a plan, doesn't do enough to establish the causal relationship between the plan and the independent claim. Well, that would be much more clear if there were a particular fee schedule or a rate that was identified in the supposed separate agreement. But when we're looking at language like a reasonable amount for those services according to the terms of the plan, doesn't that sweep in all aspects of the plan? I don't think it does, your honor. It sweeps in certainly the reimbursement rates of the plan, but it doesn't sweep in the administrative duties that are going to have, that ERISA is meant to, that the preemption, express preemption is meant to protect against. That is the entanglements between the plan and the state action. And here, the state action is a complaint seeking to recover for independent causes of action that are created by the plan administrator. The plan administrator can't make an agreement, for instance, and say, well, now we're going to make certain that ERISA, that preemption is applicable because we're going to refer to provisions in the plan under which you're going to be reimbursed. Well, the original complaint used the language according to the usual and customary prevailing rates TPSC receives for those services. That seems to be referring to a specific rate, but in the amended complaints, you reverted to this language of a reasonable amount for those services according to the terms of the plan. Doesn't services according to the terms of the plan bring in questions of coverage, of eligibility? Your Honor, I don't think it does. I think that the agreement was in place that they would be covered for this procedure. They specifically defined the procedures that would be performed by this medical provider. There was facial reanimation surgery with respect to patient DW, and there was breast reconstructive surgery with respect to patient JL. So we know what was done. We know what was agreed to be paid for, but the reimbursement rates paid were significantly lower than what was agreed to. At least that's the allegations in the complaint. These were dismissed, as I'm sure obviously you know, on 12B6 motion. So there was never any chance to go through what precisely would be the reimbursement rate and why it would not have an entanglement with ERISA. And therein lies, I think, what district court did improperly. It saw that there were references in the complaint to the plan, as there had to be, because that was the agreement reached by the, by Aetna and by the Plastic Surgery Center, and said, well, there are so many references in the complaint to the plan, it must deeply implicate the plan. But it really doesn't, Your Honor. I believe that the Plastic Surgery Center was entitled to the inferences that, yes, there are plans at issue here, and there are provisions in the plan that will need to be looked at. But that in and of itself, and those provisions simply are the reimbursement rates, and determining fair and reasonable and customary are all part of that inquiry, according to what has been pled by TPSC as the nature of the single case agreement. Why should we infer from the face of the complaint that it's only the rates that are at issue? In approving a procedure, as is reflected in the pre-certification letter for DW, for example, the idea of approving a procedure entails multiple, very specific approvals for different component services to the overarching one, right? It does, Your Honor. I think the reference is to what we call CPT codes. So, yes, there are CPT codes at issue, but the nature of that inquiry does not implicate in detail the plan. Well, hold on. That's the key point, right? You're adding this phrase in detail. I'm sorry, Your Honor. Your argument that your complaint as pled will not require any consideration of the plan, or is it that it won't require a detailed plan? And how does either one of those square with the statutory express preemption? Because the statutory expression is there has to be the connection can't be tenuous. It can't be peripheral. It has to be enough so that it would interfere with the objectives of the ERISA statute. And those objectives are several-fold. One is to protect beneficiaries and participants. And preemption here doesn't do that because TPSC would be left without any remedies. Right. So, as I follow it, then, you're not saying that this won't necessarily require resort to the plan. You're saying it won't require such an intrusive resort to the plan as to such a product. Exactly, Your Honor. That there can be entanglements, and much of the case law talks about those entanglements. But as long as they're not excessive such to defeat the goals of ERISA preemption and the overall goals of the ERISA statute, then there is not preemption. Would you agree that if the common law claim required a determination of what benefits were covered, what particular CPT codes were covered, for example, that that would be sufficient entanglement to trigger preemption? Your Honor, I can't agree with that in a vacuum. I think that's a factually sensitive inquiry that would have to be determined after the dispute were framed. And I think that can happen. There can be summary judgment motions, for instance, dealing with preemption. With respect to failure to state a claim, however, it is premature in that regard to dismiss the complaint. You mentioned various criteria to consider when it crosses the line for sufficient entanglement. In surveying various circuits, including our articulations of it, it seems like there's a very wide range of different tests that have been pronounced for where that line is crossed. First of all, is it your position that the way we have discussed it in the context of complete preemption should carry over to express preemption? And of the many different articulations in the circuits, including some of those cases that we sent you out yesterday to take a look at, how would you suggest we formulate this? I think that complete preemption is relevant, Your Honor, because complete preemption test does require the court to ascertain the relationship between the plan and the state law that's theoretically being preempted. Although complete preemption is a different silo than express preemption, I think the case law is relevant and is somewhat interchangeable. If I were going back to the lower review days, I would use my CF signal to determine that when I was citing a complete preemption case, as I did in my brief, two of them, McCulloch and Paskak, I think those standards set forth in those complete preemption cases are relevant, although not directly on point with express preemption. But the test, one of the components of the test, is the same. So how do we go about articulating where that line is? If it's not mere reference, it requires something more substantial in terms of the entanglement. Is that that it affects the structure or administration of the plan? Is it that it affects the finances of the plan? Is it that it requires interpretation of provisions of the plan? That it negates a plan provision? What does the test suggest? I think administrative entanglements, interpretation of plan provisions, conversely, items where you're seeking payment at what is a reasonable amount based on usual and customary or based on some other standard are not entanglements. Those are simple ministerial inquiries that can be handled without deep reference to the plan. So I think the deeper it gets into the plan by way of interpretation, by way of administration, that would make the entanglement significant, such that it would be preempted. I think one of the important points on these scenarios is that neither of these patients had any benefits under these plans. They had, the plans didn't cover out-of-network providers. So the only way that this relationship could be forged is through an independent legal duty, whether it be, as in the cases that were provided to us yesterday, negligent misrepresentation, promissory estoppel, or in this case, the main claim, breach of contract because of the single case agreement. Those things exist totally separate from the plan. They have no relationship at all to the plan because the plan simply didn't cover these individuals for out-of-network benefits. They had none. The cases that have been relied on to some degree are cases where there are out-of-network benefits and then there are claims by the beneficiary to sue in a state law cause of action. That's not this case. TPSC would have no remedy if these claims are preempted because it is not a beneficiary under the plan and it can't bring a preemptive enforcement action. It would be left without a remedy and just because there was an insertion into the contract that this was based on reimbursement rates pursuant to the plan. There's, in the case of DW, there's an anti-assignment provision. What about in JL's case? There's not an anti-assignment provision in JL. I was not able to locate that through the dense plan document. If there's the ability of the provider to step into the shoes of the beneficiary and bring a 502 action, should that be a different category of case? I think it does make a difference, Your Honor, if there is the ability to do that but it doesn't require TPSC to get that assignment in light of its independent legal right to enforce the contract or the theory of problem-solving. But in one of the cases, there is an anti-assignment clause so there, totally, there's nothing that could be done. And that certainly doesn't advance the purpose of ERISA to protect beneficiary's physicians, medical providers, if they know that they may not be able to get an assignment to pursue the claim on behalf of the patient and then know that there is not going to be a plan enforcement action that lies with them because their independent legal duties are going to be subsumed by ERISA preemption. What's their incentive to treat patients without being in network and having the coverage guaranteed? And here, there was an agreement to honor a separate legal duty. And I think what's also important is, to some degree, they honored it. It's not as if they're admitting there is no agreement, there is no contract, there is no obligation to pay. In all the cases, they did pay, just not at the level that they promised to pay. It's not only the level. I thought part of the respondent's argument was also that, at least in the case of DW, that there were certain CPT codes that weren't paid at all. And so that, it does implicate coverage and what benefits are available to the person. And as I said, Your Honor, I think that would have to, that's why I answered your question the way I did because I don't think the mere fact that there's an assertion in the ELB that there are CPT codes that weren't paid because of whatever reason and the forms are dense and hard to understand, that that somehow makes it an ERISA preemption case. I don't think that's enough to do at this stage of the proceedings. What about the fact that in those several cases as other circuits are wrestling with these issues, they generally seem to be addressing negligent misrepresentation claims, not breach of contract claims? I read those cases, Your Honor, last night. And I agree that's how those cases have been decided in other circuits. There was no such claim here. There is no such claim here because there was a contract formed. And in those other cases, there were no benefits paid notwithstanding the representation that there would be payments. That's not this case. So I like the language in those cases as to the independent duties, but I don't have a negligent misrepresentation case here. Perhaps it could be stretched out to say they negligent misrepresented that they would pay a certain amount, but I think that would be, I don't think that pleading would really carry the day. Can we take the existence of a contract, a fair inference of that from the complaint given that the attachment to it with the notes of the phone call suggests that Edna's saying there is no single case agreement. They won't negotiate that. Well, Your Honor, I think that would be a factual question. I think that there are those notes and I think they would show that there should be evidence, that is evidence of a meeting of the mind that there was a single case agreement notwithstanding that the defendant claims there is no agreement or that they didn't come to the exact terms of such an agreement. I think that those notes and the actual performance thereafter do suggest the existence of an agreement. Is there a difference between the highest in-network rate, that term, and the term reasonable rate? Does one require a deeper dive into the terms of the plan? I think there is a difference between highest in-network rate and reasonable. Reasonable, I think, would imply that it was usual and customary in the area for physicians of that skill set, whereas if it's the highest rate in the plan, then the plan rates govern. So the contract can be reached with a term that the payment will be made on the highest rates under the plan, but similarly, one could be reached that it would be based on reasonable, which I think, as I said, implies usual and customary. And what about the language in the precertification letter saying that there hasn't been verification whether any applicable dollar limits under the plan have been exhausted or will be exhausted, or that reimbursement will be based on standard coding and bundling logic and any mutually agreed upon contracted or negotiated rates subject to co-pays and co-insurance requirements? Doesn't that, again, bring in multiple aspects of the plan that would need to be examined, including whether caps had been exhausted? By its term, judge it does. I won't dispute that that does implicate certain provisions of the plan, but if the administrator of a plan, while negotiating a single-case agreement, could make references to certain things in the plan, then it could ensure that, by that analysis, it could ensure that every claim by a provider would be preempted and the provider would have no remedy because it's inserting into the contract, or trying to insert into the contract, certain ERISA analysis, an analysis of the plan that would be required. But that's not what prompted this arrangement. They were told to do the procedure. You have the authorization to do it. And, yes, there were some carve-outs in the preauthorization letter, but not enough to, as a matter of law, find that the ERISA preemption applies. Isn't the remedy for that just as much in the hands of the provider as it is the insurance carrier? The remedy meaning the provider could say, hey, I don't like what you're telling me. I'm not going to do the work. Yeah, that remedy is available. How about the remedy of just, in the allegedly freestanding agreement, to put specific prices in that correlate with the codes? Does that do that? In a theoretical world, I think that's what we would do. Why is that theoretical? Because when you're in the middle of surgery, when you're beginning a surgical procedure, it's like the fog of war. These surgeries like this are 10, 15-hour surgeries. They're not a simple broken leg setting a bone. You see the numbers. The numbers are incredible. We're talking about a $410,000 surgery because the surgeries take extensive time. There are assistant surgeons there. You're not suggesting that the surgeons are the ones who are negotiating these contracts, are you? I'm sorry, Judge? You're not suggesting the surgeons are negotiating these contracts, right? No, no, I'm not, Judge. Let's leave that aside for a second. I think Judge Krause's point is, you are not claiming that you had no involvement in this contract. No, not at all. There is a contract. We negotiated, offer acceptance, the whole thing. So then why is it that you weren't free to say, hold on a moment. That's a written language. That's going to be preempted. I'm not looking for that relationship.  Do we have a deal? That could have been done, Your Honor. But I don't know that in the practical reality of medical treatment that that is how these contracts get worked on. And if we want to make the doctors lawyers, so be it. But I don't think that's the way these things work, that it's almost impossible to... I don't think, of course, the doctors are negotiating the contracts, but I suppose we'll just disagree on that. It's true. It's the medical, it's the staff people who are negotiating it, and they may not have the... Is it possible that once that single case agreement was negotiated, that the doctor or his people would consider him to be, quote, unquote, an in-network provider at that point? I don't think it... I mean, there can be that leap, I guess, but I don't think that's what happened here. There was a single case agreement, and that was the operating document. They didn't necessarily say, now we're in-network and we'll be paid as in-network. Just for that specific surgery I'm referring to? Yes, for that... I think for the DW surgery, yes, because they referenced that they would be paid pursuant to the highest amount allowed by this plan. So if you want to put that label on it, that they went in-network on that... Yes, that's... There's no preemption. That's possible, but that doesn't... That still leaves them with no remedy if, in fact, they're in-network and they... and they do certain procedures that are then denied by the plan administrator. They don't have a clause of action because they can't bring it under as a plan administrator, and there's an anti-assignment clause. So I don't know that it's a distinction with a difference if you put them as an in-network, classify them as in-network, pursuant to a single case agreement, or say it's just a separate legal duty. I think there are terms without a difference, quite frankly. Is this a problem as a practical matter that arises for in-network providers who don't have an assignment? I think a lot of the cases that... from other jurisdictions talk about in-network providers who were denied benefits for other reasons, like pre-existing condition, like no pre-authorization. So I think that the problem does exist for in-network providers, but I think the problem is exacerbated for out-of-network providers. They don't have the benefit of the plan. They are being asked to treat someone, and once the plan administrator decides they should be treated and makes an agreement, they should live up to the agreement. I think it's really as simple as that. Okay. Thank you, Your Honor. Mr. O'Boyle, good morning. Good morning, Your Honor. Thank you very much. And may it please the Court, my name is Colin O'Boyle, and I represent the FLE's Aetna Life Insurance Company and Aetna Health, Inc., which, if it's okay with you, I'll refer to generically as Aetna. Thank you. This case, as you know, relates to two lawsuits that were filed by a single provider that were consolidated on the appeal. In both instances, the provider was providing services to a member who was covered by an ERISA-governed plan. In both lawsuits, the provider filed exclusively state law claims, demanding benefits for what was provided. The single issue before Your Honors today is whether the complaints as pled in these two cases are expressly preempted under 514 of ERISA, which the Supreme Court and this Court have routinely held to be purposefully broad. The District Court found that what was being asked in these two lawsuits directly impacted the essential function of ERISA, which was claims processing and adjudication, calculation of benefits. That, again, goes too squarely within the contours of what has been found to be preempted, and we would ask that this Court not try to retool or rethink what might be facts in another case, but instead look at the facts of this case. How aware has just a reference to rates been considered clearly preempted? Your Honor, I think in 1975, the employee's salary case, there was a discussion of what would be a determination of the benefits under a plan, and the Court found that it was necessary in order to determine whether there was liability in that case to look to the terms of the plan and try and calculate what the impacts were going to be monetarily. I think that was in 1975. I think the same thing, Your Honor. But that didn't involve a provider who was claiming reimbursement for services that they had provided pursuant to an alleged agreement, right? Wasn't that fiduciary responsibilities of an administrator in trying to ascertain whether they had breached those responsibilities or not? It's a very different situation. Factually, Your Honor, it's a different context. Essentially, what was being done in both circumstances is the same. The claim administrator was being asked to look to the plans to make a determination of what benefits were. We have before us, and we sent you, and apologies to both counsel for the late notice, but we sent you a number of cases from other circuits where they're wrestling with this issue in the context of providers seeking reimbursement where looking to something as simple as the damages calculation, the rates that are supposed to be paid, for example, they're concluding that that is sufficiently peripheral that under the Supreme Court's more recent case law, such as travelers, that it's not preempted under 514. Why shouldn't we embrace the approach of our sister circuits?  In those cases, as was noted during the prior argument, in those cases it was an issue of negligent misrepresentations. Here, that's not what's being alleged. Why does the cause of action make a difference as to whether there can exist a common law cause of action that's not preempted? Actually, the Court's decision in the access matter talks very neatly about that issue. And what the Court in access help found was, and I apologize for that, there's a distinction about what is the core function of a risk. And one of them is certainly to essentially ensure that beneficiaries can access benefits. The other one is ensuring that plans are not going to be bogged down in litigation by every provider who comes about who thinks that they may not have had their claim processed properly. And it's in the last section of the access case that talks about how in a misrepresentation case, it may be that the provider can control that. I'm sorry, the payor can control that. If you don't make a misrepresentation, don't worry about getting sued. But what the Court was concerned about in that case, which was the most recent of the cases Your Honors had indicated, the Court was very concerned about circumstances in which there weren't misrepresentations and the impact that that would have on the plan and plan administration. And the Court discussed in two paragraphs the discussion how if we allow in a non-misrepresentation case for a non-PAR provider who is not a beneficiary or under ERISA to file a lawsuit and say, I think you've processed this one wrong, you've now opened up the floodgates and have gone contrary to what was one of the goals of ERISA, was to create a uniform statutory structure for claims to be processed, not just so a beneficiary can get a benefit, but to ensure that the system functions properly and the payor will not have to worry about 50 different states having different elements or standards for what a misrepresentation or an unjust enrichment or an implied-in-fact contract might have. There has to be some protections for the plan as well. We don't have briefed trusts on appeal the issues of promissory estoppel or unjust enrichment. We're looking at breach of contract, right? And in this case, and I agree with you, there are no misrepresentation cases, which is why I think that those cases from the get-go are distinguishable. But why isn't the elements of a breach of contract action sufficiently akin to misrepresentation? I mean, their argument on the breach of contract is you represented that you would provide this performance in exchange for our consideration, and you failed to do so. And Your Honor pointed out very nicely the idea of what factually happened in the case. And in this case, it was not our notes, but in fact the provider's notes that indicated that Aetna refused to enter into a single-case contract. And I've seen those, the standalone document, dollar sign on there, CPT codes included. It didn't happen here. So the idea that there was a separate contract, separate and distinct from that, isn't factually what happened here, isn't factually what's been pled here. What's been pled was there was a pre-certification, and the pre-certification, and I know Your Honor said from that earlier as well, it pushes it all back into the plan. This was not a standalone agreement. So factually in this case, we're not looking at what could theoretically be a standalone contract implied in fact in this case. And the implied in fact contract and the unjust enrichment were taken essentially at the same level by the access medequip case. Because in both cases, because there wasn't a misrepresentation, and here that would be the case, there wasn't a misrepresentation, the idea is that there's a separate contract under the theory. Aetna can't control whether it has stated accurately, which is what has happened in the agreement, how often it's going to get sued if someone's just simply unhappy with how much it's been paid. And that's what the concern was. In the same string of cases that Your Honor referenced, if there's not based upon a misrepresentation, you've opened up the floodgates to litigation, whether it be characterized as an unjust enrichment theory or an implied in fact contract, there's not a claim that Aetna did something wrong in a misrepresentation. It's saying, you just didn't process the claim properly. You didn't find out what the payment benefits were properly, and I want to challenge that. And when you look at the construct of ERISA from the beginning, the legislature made a decision. We are not going to allow providers to have standing to file lawsuits. Is there argument that Aetna didn't process it properly or didn't process it according to the terms of the agreement? Because I understood them to be saying, we had a deal and you're going to pay us a certain amount, and all you need to do is pay us that amount, but you don't have to actually process it pursuant to the plan. What's actually interesting, Your Honor, and Judge Krause had alluded to it earlier, the idea that some claims were denied. What's significant in the complaint is what is not alleged, is we submitted our CPT codes, you pre-certified those CPT codes, we submitted a bill with those CPT codes, and you denied some of them. That's factually not what's alleged. What's alleged is we asked for pre-certification, we got pre-certification, and some of the claims that we've billed weren't paid. The distinction's very important because they're not saying that Aetna actually went back on what was promised. What they're saying is what they ultimately decided to bill Aetna, some of that wasn't paid. And the reason that's particularly significant is, if you go back to the pre-certification part, it specifically says, if the member receives services from this provider that are not approved in this letter, this member may be responsible for all bills. It pushes it all back into the plan. So in order, as Judge Krause alluded to earlier, if there was a claim that was denied, a particular CPT code, how do you determine whether that was proper or improper? You have to go back to the plan to determine whether that was something that should have been covered on the terms of the plan because it's not part of this pre-certification letter. So I think your adversary indicated earlier that perhaps there would prove to be entanglement, perhaps that as you get into the case and discovery, there would be facts that implicate the plans, and if so, that's what a renewed notion to dismiss or perhaps summary judgment would be appropriate for. Why is that in conflict with the standard that the Supreme Court has given about how the relates to function of express preemption should be interpreted? Because we look back to the face of the complaint, and the face of the complaint is referring back to the plan. It requires plan considerations of coverage and policy determinations. If the standard that's created by this court is, allege what you will and then go and seek discovery because there might be something out there, if they relied upon something that Edna said, pleaded. Say that this is not based upon your representation that you would process this claim pursuant to the plan. It's because you told me you would pay me $10,000 for this CPT code, and that's what I relied upon, and that's what I did. Therefore, pay me. And then you at least have a pled complaint about what they actually relied upon. To allow the complaint to stand and discovery to proceed so that the provider can find something that they might base a claim on, again, defeats the idea that ERISA is created not just for the beneficiaries, but to provide some protections for the plans that they're not going to be spending half their time litigating someone's discontent with how a claim was processed. Are you suggesting there's a legally significant distinction between an agreement that contained in it the list of highest in-network rates and a reference in a contract that said, we'll use for these particular services the highest in-network rates? I apologize, I'm not sure I understood the distinction. Well, you seem to be saying that just by referring, that that implicates preemption. I'm asking, are you saying that there's a legal distinction between a contract that listed out those in-network rates in the four corners of the contract versus one that used the incorporation by reference of the highest in-network rates that were available elsewhere? I think what I'm addressing, Your Honor, is the case law that you've asked us to look at to address how those courts are addressing matters. And the idea that there may be a standalone misrepresentation based upon specific misrepresentations that may be theoretically cognizable under those cases, I guess the question is whether the court should go in that same direction, but factually isn't what happened here. Well, I think maybe following up what Judge Cross is saying, I understand the question to be, how much can a complaint plead by reference or a contract create by reference to the plan before you become entangled versus a standalone agreement that may seem to mirror the plan and therefore be allowed? So to take it to its logical conclusion, if you cut and paste the entirety of the plan into an agreement and said, here's what we want and you guys agree to it, presumably that would be okay. That doesn't require resort to the plan. You have another contract, right? I would actually disagree with that, Your Honor. I think that it does actually put you back to the plan because all it's saying is here's the provisions of the plan and these are not standalone agreements in a document. These are the provisions from the plan that we're just, for your convenience, putting into a document. You're putting into it, but that document is now a contract, right? It's not for your convenience. It's saying, hey, I want to perform. I mean, take the hypothetical then. I want to perform the service. I've looked to your plan. I think that's a good deal, so I've dropped it into a new document. I'm sending it over to you as an offer. Tell me if you agree. And you agree. To interpret a dispute under that, we don't need to reference the plan. We need to reference that contract, right? I think theoretically, I would say not what happened here, but I would say theoretically that there can be standalone agreements and that was referenced before. In this case specifically, we're not going to do that. But the idea that there may be a finite document that says, here's your CPT codes. Here's the dollar amount I'm going to pay you for each one. I'm not referencing plan coverages, policies, co-insurance, which is another issue we haven't gotten into yet, but it is very important in plan configurations, what the deductible will be, what the co-insurance will be. If it says, I, Aetna, will pay you $10,000 for these following CPT codes, then you might have a case that talks about a separate standalone agreement that isn't tethered to the plan, which is factually not what we have here. The pre-cert letter, which we've seen, Your Honor, as referenced, talks about coverage, talks about how there is not network benefits otherwise, so we're going to say that there is. So we're going to look to the plan to see what a network benefit would look like, what the coverage is going to be for a network benefit, what the pay scale is going to be for a network benefit. It specifically says that the member will be responsible only for in-network cost-sharing requirements, again, in-network covered by the plan. So factually what we have here is not a situation where there's a single standalone agreement that identifies everything. And so could that theoretically happen? Sure, I suppose that it could. It's just in terms of what's before the court for consideration who are related. How do we go about articulating that test for where it crosses the line? Other circuits have been struggling with this and have multi-part tests or two-part tests. How would you suggest we articulate the test for sufficient entanglement that there's preemption under 514? I would first suggest, Your Honor, that this may not be the case. And the reason I say that is because in order to have to create the contours of what theoretically could be the test, we're not on that cutting edge. Right now what we're considering is a provider who reached out in the first instance because the plan said to. So they reached out to them and said, hey, here's our coverage. There was a determination there would be coverage for certain things. Then there was a payment pursuant to the terms of the plan according to the pleading. So in terms of what could the test ultimately be, could be discussed, in this case, to say that it's going to the essential functions of administering a plan, construing the plan for coverage, construing the terms for coverage, payment obligations, I think falls squarely within that without the court having to change anything because the court wants to discuss other circumstances where it's not a provider actually pleading in the complaint that the promise was to pay me pursuant, in accordance with the terms of the plan, then I think that's a separate issue. I think that the courts that have looked at this, and interestingly the access case that was also referenced and discussed earlier, that had a two-part test. And I note it not to suggest that the court adopted, but because it's significant what happened. It was a two-part test that the state law claims address areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan. That was one of the initial criteria, and that's what we're talking about here. And the claims directly affect the relationship among the traditional ERISA entities, the employer, the plan and its fiduciaries, and the participants and its beneficiaries. What the court was focusing on that was, it doesn't have to impact or involve one of them. It has to impact the relationship between them. And what was discussed was the idea that there would be plans that provide specific benefits. And what's being asked here is to change that, alter that, pay more than what's required under the plan. So the relationship between the plan sponsor and the claims administrator, which are the typical people involved in these, it impacts that relationship. How does it impact that relationship for a third-party provider to enter into an agreement? You've asked us to provide these services. We will provide these services if we're paid under the following fee schedule, a fee schedule set out in the plan, and that's agreed to by Aetna. How does that affect the relationship among the parties to the plan itself? Because it goes to the interpretation of what the plan is going to be. The claims administrator's task is to review the plan and to administer it based upon the coverage determinations, payment provisions and whatnot. By allowing a third party to come in and now require changes in that is going to impact, whether it's a self-insured or a fully insured plan, is going to impact the relationship between the two because it goes to what compensation is being paid out of it. And I would also note that in the access case, what was interesting is there was a concurrence, not in the site that your honors provided, but the opinion was ultimately reinstated. And there's a 698F3D229. The circuit looked back and reinstated the opinion that had been vacated at one point. And what Judge Jolly had indicated was if I wasn't in the context and where I am now with the Memorial Hospital case being our controlling case law in the circuit for so long, I would change it. These were considered conjunctive, the two things that I just referenced. Judge Jolly said if I'm untethered by that, as your honors would be, I would make it disjunctive. And so for Judge Jolly, untethered by Memorial Hospital and its progeny, he would have had it that a state law claims address areas of exclusive federal concern, such as the right to receive benefits on the terms of an ERISA plan. That one element alone is what prompts express preemption. What role should the availability of a remedy have in this circumstance? I'm sorry, my time is up. Thank you very much. There's a distinction your honor asked about it earlier. Under 502, it's actually an element that a provider have a cause of action under ERISA in order for there to be complete preemption. Under 514, that's not an element. It's not an actual requirement that in order for something to quote-unquote relate to the ERISA plan, that the provider have another cause of action and be able to bring something in some fashion. And it's consistent with the idea that when ERISA, or when the legislature passed ERISA, enacted ERISA, they defined who was going to be able to bring causes of action. And they were not trying to create and ensure that a third party can do that. And the reason is because there is a construct created by obligation in every ERISA plan for administrative remedies. And the member, and your honor will see in the pre-cert letter that we've made part of the record, it doesn't just go to the provider. In fact, it goes to the member. And there's a copy sent to the provider as well. If there's a problem, if, for example, there's not a CPT code that was not covered that they said would be covered under the pre-cert letter, then file an appeal under the administrative procedures as the member and say you got it wrong on that. How do you do that in DW's case with an anti-assignment clause in play? I'm sorry, your honor. What I was suggesting was the member has every right to do that. And I think, your honor, in... So the third party provider is to rely on the member to pursue an appeal for reimbursement of the third party provider? I would say two things. One, in a sense, they can be. And it goes back to the idea that the member is the person ultimately responsible for the payment anyway. And that's what ERISA contemplated was this administrative remedy because the pre-cert letter is going to the member as well, saying this is what's going to be covered, this is what's not going to be covered. But the idea also, your honor, and this was referenced in one of your prior opinions in the American Orthopedic, the processing of claims and denials may actually be permitted by the provider. The provider can pursue some of those. And if Aetna were to allow that, that is not a waiver of the anti-assignment that would prevent a lawsuit from ultimately being filed. So what you'll have is actually providers pursuing these administrative remedies on behalf of the member without an issue of writing a file of an anti-assignment provision. And that was, I think, recognized by your honor as... You talked about the possibility of powers of attorney? Oh, no, no, your honor. In that case, your honor, you considered both the idea of an anti-assignment provision and whether there had been a waiver. And what was argued was, well, they allowed, the payor allowed the provider to submit some claims to be reprocessed, to argue that there had been some anomalies created. And what your honor found was allowing that to process doesn't run a follow of an anti-assignment provision that may ultimately preclude that provider from going to court. So the idea would be, yes, a member would be the one typically to pursue the administrative appeal. But even in the face of an anti-assignment provision, there may be circumstances where the payor, sorry, where the provider is the one actually doing it and making the same argument that, wait a minute, I'm pretty sure that there's an anomaly here. Let's pursue our ERISA administrative remedies and address whether that anomaly exists and whether this should be reversed, more compensation paid or whatnot. But isn't that just strictly as to whether a benefit is covered versus, and I'm making reference right now to the case of Blue Cross, the 9th Circuit case, whether the dispute here is not over the right of payment, but over the amount or level of payment. And the mere mention of ERISA plan in a complaint is not, in and of itself, sufficient to warrant a fining that the state law relates to the plan. If I'm remembering the same case you're referencing, the Blue Cross case dealt with a participating provider agreement, which would be a separate sort of construct from what we have here. That would be an in-network provider who had a set of requirements under a plan. I believe in that case there was even arbitration provisions that were permitted, specific administrative remedies provided for that provider through its participating provider contract with the payer. And so that case I think is factually distinguishable because that was an in-network provider addressing rights that were permitted under a specific participating provider agreement, which is not what we have here. Okay, I'll ask you the same question I asked counsel then. The fact that you've agreed to enter into this contract to allow the surgeon to do the surgery and you said, yes, I'll pay, wouldn't at that moment, would he be considered an in-network provider at that point for that specific case? And actually what I would step back from, we don't agree that there was a separate contract created. What we do agree happened was a call was placed by a provider pursuant to the terms of an ERISA plan to get pre-certification. You don't consider pre-certification an agreement then? I do not. What it is is a determination under the plan of whether there will be coverage and payment. I don't think it's a standalone agreement. I think that's the distinction. And the reason is because the contract that's being called to be inquired about is already an existing contract between Aetna and the member. That contract exists. The only thing that's happening here is a third party is coming in and saying, as to that agreement between the two of you, can you give me some idea on coverage? So I don't think that independently creates a separate contract. I think what it does is pursuant to the terms of the already existing contract, you allow someone to make a call to talk about coverage determination. Why should it be conceptualized that way rather than a separate agreement between that third party provider and Aetna? The third party provider is memorialized in the pre-certification letter that says, coverage for this service has been approved with a list of particular services. And on the basis of that agreement, the provider is then going forward to provide those services, turning to Aetna for reimbursement. And what, again, I would go back to is why are they calling Aetna in the first instance? And they're calling Aetna not because Aetna has a pocketbook, but because Aetna is the claims administrator for a specific plan. And what's being determined is whether there's coverage under that plan to be paid either fully insured or self-insured by a third party. All that's being done is a consideration of that plan that exists between Aetna and the member. And that's why, Your Honor, when these pre-certification letters go out, it's not just to the provider saying, here's our understanding. You and I have something going on now, right? It's sent to the member. And the idea at the core of all of this is there's a benefit to the member because the member has benefits. I may agree to forward it to the provider, but at the core of this entire system is the idea that Aetna is processing a claim whereby the member is a beneficiary of benefits, and that is going to be paid or not paid based upon the terms of the plan. A phone call that's prompted by the plan to consider what's in the plan and to provide the member with a forecast of what's in the plan is still with the member, even though a third party might be the one asking it. A particular circumstance where the service that is necessary is not within the plan, then we have the plan administrator necessarily reaching out outside of that network to someone who would not otherwise engage with Aetna at all. The recourse is one of two things. Either Aetna stops taking calls to allow for pre-cert, or it continues to do what is permitted under the plan, which is to give some indication of what's going on. And in order to help facilitate things, when you look back at what DW was, we said, yes, on coverage, we paid. So this isn't retracting. How do you determine that payment? Pursuant to the terms of the plan at the network rate. And when you've agreed that it would be the highest within the network, how would you make that determination? Candidly, Ron, I think that's a machine. I'm not entirely sure how that works, but there's claims edits being put in based upon the plans that are put into the computer system, and the determination is based upon what the plan and what the sponsor, because ultimately they're the ones that determine what's going to be paid or not paid. The plan sponsor elects, I'll allow compensation at this rate, I'll cover that type of services. Whatever it may be, the plan sponsor creates the checklist. That's a separate document somewhere that doesn't necessarily, it's not necessarily in the plan itself. I think it's part of the plan, Your Honor. It's part of the plan? Yeah. Thank you, Your Honor. Just a couple of brief points, Your Honor. The legislature did make a determination that medical providers could not bring in a risk of plan enforcement action, but there is no determination that they could not bring an independent claim, and the entire cases that we looked at last night show that that's precisely what is permitted. That is an independent claim by a medical provider based on state law issues that don't involve excessive entanglements with ERISA. In fact, in the in-home health versus prudential case, which was provided to us at 101 F3rd 600 8th Circuit, one of the quotes in that case I found to be quite relevant, and it reads, if providers have no recourse under ERISA or state law where there is no coverage under the express terms of the plan, but a provider has relied on assurances that there is such coverage, providers will be understandably reluctant to accept the risk of nonpayment and may require upfront payment by beneficiaries or impose other inconveniences before treatment is offered. This does not serve but rather directly defeats the purpose of Congress in enacting ERISA, and that's precisely what the system that Ettin is arguing for here, that we can make all kinds of assurances. We can tell you that we're going to pay. We're going to pay highest in network. We're going to pay reasonable and customary. And when we don't, you're out of luck because you can't bring a prior enforcement action, and your common law claims are preempted. And that system certainly doesn't advance the goals of ERISA. One of the questions that was also asked was the damages calculation. There is no difference in a damages calculation for a breach of contract case or a negligent misrepresentation. The damages are going to be the difference between what was paid and what was entitled to be paid. So that doesn't involve significant entanglement with the plan. And in the negligent misrepresentation cases, it was actually found that those damages calculations don't create the level of involvement is peripheral, and it would be the same way for a breach of contract action. All right. Thank you, counsel. Thank you, Your Honor. Your endurance through a long argument and a very helpful briefing and argument. We request that counsel split the costs and order transcripts of the argument here, and we'll take the case under advisement.